NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

MARVIN CARTER, II, *Plaintiff/Appellant*,

*v.*

BNSF RAILWAY COMPANY, *Defendant/Appellee*.

No. 1 CA-CV 23-0164
FILED 2-13-2024

---

Appeal from the Superior Court in Maricopa County
No. CV2019-014216
The Honorable Sherry K. Stephens, Judge *Retired*
The Honorable Jay R. Adleman, Judge

**AFFIRMED**

---

COUNSEL

Ahwatukee Legal Office, PC, Phoenix
By David L. Abney
*Co-Counsel for Plaintiff/Appellant*

Breyer Law Offices, PC, Phoenix
By Mark P. Breyer, Brian C. Fawber
*Co-Counsel for Plaintiff/Appellant*

Thornton Mostul Fuller, PLLC, Seattle, WA
George A. Thorton, Andrew Fuller
*Co-Counsel for Plaintiff/Appellant*

Lewis Roca Rothgerber Christie, LLP, Phoenix
By Susan M. Freeman
*Co-Counsel for Defendant/Appellee*

Atkinson Baker & Rodriguez, PC, Albuquerque, NM
By Justin Duke Rodriguez, Julia E. McFall
*Co-Counsel for Defendant/Appellee*

---

## MEMORANDUM DECISION

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Anni Hill Foster joined.

---

**C A T T A N I**, Judge:

¶1        Marvin Carter II appeals the superior court's grant of summary judgment in favor of his former employer BNSF Railway Company on his claim for injuries premised on strict liability under the federal Locomotive Inspection Act ("LIA"). For reasons that follow, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

¶2        Carter was employed by BNSF as a locomotive engineer. In September 2018, Carter and his crew were moving two locomotives to a siding track to assemble a train. After moving the first locomotive, Carter noticed oil coming out of its doors and spreading "all over" the catwalk. He recognized that the locomotive would need to be inspected by a mechanical team, and because there was no maintenance or repair facility in the area, he moved it to a designated location on the track known as the "Bad Order Spot" to await inspection and repair.

¶3        After parking the locomotive at the Bad Order Spot, Carter engaged the hand brake and tested to ensure the locomotive was secured. He did not specifically recall shutting the locomotive down but may have done so. When leaving the cab, Carter slipped on oil on the catwalk and injured his knee.

¶4        Carter sued BNSF under the Federal Employers' Liability Act ("FELA"), asserting BNSF was strictly liable under LIA for violating safety regulations. Carter also asserted liability based on simple negligence.

2

BNSF moved for partial summary judgment on the LIA claim, asserting the locomotive was not "in use" at the time of Carter's injury, which is a prerequisite for liability under LIA. After briefing and oral argument, the superior court granted summary judgment in favor of BNSF on the LIA claim. Carter later filed a motion to "revise" that ruling with a supplemental statement of facts. The court treated the motion as a request for reconsideration and denied it without seeking a response from BNSF.

¶5 With Carter's simple negligence claim still pending, the court entered judgment for BNSF on the LIA claim and certified the judgment on that claim as final and immediately appealable. *See* Ariz. R. Civ. P. 54(b). Carter timely appealed, and we have jurisdiction under A.R.S. § 12-2101(A)(1).

## DISCUSSION

¶6 Carter contends the locomotive was "in use" at the time of his injury, and that the superior court thus erred by granting summary judgment for BNSF on his LIA claim. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a). We review a summary judgment ruling de novo, *Coulter v. Grant Thornton, LLP*, 241 Ariz. 440, 447, ¶ 23 (App. 2017), viewing the facts in the light most favorable to the party against whom judgment was entered and considering only the evidence presented in the summary judgment record. *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 329, ¶ 14 (App. 2014); *Brookover v. Roberts Enters., Inc.*, 215 Ariz. 52, 57, ¶ 17 n.2 (App. 2007) (noting that review of summary judgment is limited to evidence before the superior court when ruling, not additional evidence first presented in a motion for reconsideration).

¶7 FELA provides the remedy for railroad workers injured on the job, authorizing employees to bring negligence claims against railroads. *See* 45 U.S.C. §§ 51–60. LIA[1] provides a supplemental remedy for negligence claims brought under FELA by establishing strict liability based on negligence per se for violations of regulations outlining the safe "use" of locomotives. *Wright v. Ark. & Mo. R.R. Co.*, 574 F.3d 612, 620 (8th Cir. 2009); *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907, 910 (7th Cir. 2020); 45 U.S.C. §§

---

[1] Congress amended the Boiler Inspection Act ("BIA") in 1915 to apply to the entire locomotive and all its parts. Act of Mar. 4, 1915, ch. 169, § 1, 38 Stat. 1192. Thereafter, BIA as amended became known as LIA. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 629 (2012).

53–54; 49 U.S.C. § 20701.  Under these regulations, carriers are required to conduct a daily inspection for non-compliance with the act and repair any conditions before the locomotive can be used.  49 C.F.R. § 229.21(a).  Part of the inspection is to ensure that the floors and passageways of the locomotive are kept free from oil that creates a slipping hazard.  49 C.F.R. § 229.119(c).

¶8          The preliminary question under LIA is whether the locomotive was "in use"[2] at the time of the accident, which is a question of law for the court.  *Brady v. Terminal R. Ass'n of St. Louis*, 303 U.S. 10, 13 (1938); *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 329 (4th Cir. 1998).  The purpose of the "in use" limitation is to provide railroads with the opportunity to remedy hazardous conditions before LIA exposes them to strict liability.  *Wright*, 574 F.3d at 620.  When analyzing whether a locomotive was "in use," courts look to the totality of the circumstances, considering the location of the equipment at the time of the accident and the activity of the injured party.  *See Deans*, 152 F.3d at 329; *Wright*, 574 F.3d at 621; *Pinkham v. Me. Cent. R. Co.*, 874 F.2d 875, 882 (1st Cir. 1989); *Huntsinger*, 398 P.3d at 408.

¶9          In *Brady*, the Supreme Court held that a train was "still in use, though motionless" when the train was only temporarily placed on a receiving track and "had not been withdrawn from use."  303 U.S. at 13.  But the Court noted the general rule that a train car that has reached "a place of repair" is not "in use."  *Id.* (citing *Balt. & Ohio R. Co. v. Hooven*, 297 F. 919, 922–24 (6th Cir. 1924)); *see also Hooven*, 297 F. at 922 (holding that a train undergoing repairs, even if "such withdrawal be but temporary," is not "in use").

¶10          Here, even assuming the locomotive was initially "in use," it was not "in use" at the time of Carter's injury.  After Carter discovered the oil, he moved the locomotive to the Bad Order Spot to be inspected.  Absent a nearby repair facility, the Bad Order Spot served as the designated location for repair at that location.  Moreover, Carter himself noticed the oil, and he had finished securing the locomotive in the Bad Order Spot before he was injured.  Because Carter had already secured the locomotive in a place of repair, the locomotive was not "in use" at the time of his injury.  *See LeDure*, 962 F.3d at 910 (holding that a train was not "in use" because it was

---

[2]     The Federal Safety Appliance Act also has an "in use" requirement, and courts sometimes rely on cases construing "in use" in that context when considering LIA claims.  *Huntsinger v. BNSF Ry. Co.*, 398 P.3d 403, 407 n.9 (Or. Ct. App. 2017).

"stationary, on a sidetrack, and part of a train needing to be assembled before its use"); *Wright*, 574 F.3d at 622 (holding that a train in a "repair in place" track undergoing inspection was not "in use," emphasizing its "blue flagged status"[3] and locked position).

¶11　　　Carter cites a variety of cases that, in his view, support a finding that the locomotive here was "in use." But in all of those cases, the train either was not taken to or had not yet reached a place of repair, a critical difference from the circumstances presented here. *See, e.g.*, *Delk v. St. Louis & S.F. R.R. Co.*, 220 U.S. 580 (1911); *Johnson v. S. Pac. Co.*, 196 U.S. 1 (1904); *Great N. Ry. Co. v. Otos*, 239 U.S. 349 (1915); *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33 (1916); *Chi. Great W. R.R. Co. v. Schendel*, 267 U.S. 287 (1925); *S. Ry. Co. v. Bryan*, 375 F.2d 155 (5th Cir. 1967); *Raudenbush v. Balt. & Ohio R.R. Co.*, 160 F.2d 363 (3d Cir. 1947); *Deans*, 152 F.3d at 326. These authorities thus do not alter our analysis.

¶12　　　Carter next asserts that, because he may not have activated the emergency shutdown before his injury, the locomotive was still "in use." But regardless whether the engine was fully shut down, Carter had—by his own testimony—already done all that was necessary to secure the locomotive in the Bad Order Spot by the time of his injury.

¶13　　　Carter further argues the superior court wrongly failed to consider that only a few minutes passed between actively moving the locomotive and his ultimate injury. *See Raudenbush*, 160 F.2d at 368 (reasoning that a locomotive was still "in use" when it had been uncoupled and stopped for only "an interval of but a few seconds or minutes between the active use of the locomotive and the time of the accident"). But again, the interval (however short) is not alone dispositive, and here, the fact that Carter had noted the anomalous oil and already secured the locomotive in a place of repair compels the conclusion that the locomotive was not in use. *Compare id.* at 364 (active use of a locomotive to move train cars within a yard, then injury almost immediately after the crew cut the train cars loose).

¶14　　　Finally, Carter asserts that the locomotive was "in use" because "the unit would soon be ready for departure, the unit was not being moved to any repair facility, and any servicing and maintenance work would presumably soon be over." But the authority on which he relies in fact reasons that a locomotive that is stationary and waiting to be serviced or repaired is not "in use." *Balough v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 950

---

[3]　　　Blue flags serve as a warning that work is being done in the area. *Carder v. Ind. Harbor Belt R.R.*, 205 F. Supp. 2d 981, 985 n.3 (N.D. Ind. 2002).

N.E.2d 680, 698 (Ill. Ct. App. 2011). Moreover, the record does not support Carter's assertions that "the unit would soon be ready for departure" or that "any servicing or maintenance work would presumably soon be over." To the contrary, Carter made clear that the locomotive needed to be put aside for inspection by a mechanical team due to the oil leak. Regardless whether the locomotive was eventually used later that day, it was not "in use" at the time of Carter's injury for the reasons stated above.

¶15        Accordingly, the superior court did not err by entering judgment in favor of BNSF on the LIA-based claim. The court looked to the totality of the circumstances and reasonably determined the locomotive was not "in use" because it had "reached a place of repair" by the time Carter was injured.

## CONCLUSION

¶16        For the foregoing reasons, we affirm.

